Martin J. Brill (Calif. Bar No. 53220)
Philip A. Gasteier (Calif. Bar No. 130043)
Beth Ann R. Young (Calif. Bar No. 143945)
Krikor J. Meshefejian (Calif. Bar No. 255030)
**LEVENE, NEALE, BENDER, YOO & BRILL, L.L.P.**
10250 Constellation Blvd., Suite 1700
Los Angeles, California 90067
Telephone:    (310) 229-1234
Facsimile:    (310) 229-1244
mjb@lnbyb.com; kjm@lnbyb.com; pag@lnbyb.com; bry@lnbyb.com
*Counsel for Plaintiff Official Committee of Creditors Holding Unsecured Claims*

George Hofmann – Bar No. 10005
**COHNE KINGHORN, A PROFESSIONAL CORPORATION**
111 East Broadway, 11th Floor
Salt Lake City, UT  84111
Telephone:    (801) 415-0132
Facsimile:    (801) 363-4378
ghofmann@cohnekinghorn.com
*Local Counsel for Plaintiff Official Committee of Creditors Holding Unsecured Claims*

---

## IN THE UNITED STATES BANKRUPTCY COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| In re **CS MINING, LLC**<br><br>                        Debtor | Bankruptcy Case No. 16-24818<br><br>(Chapter 11)<br><br>Judge William T. Thurman<br><br>Adv. Pro. No.: |
| Official Committee of Creditors Holding Unsecured Claims of  the Bankruptcy Estate of CS Mining, LLC,<br>Plaintiff,<br>            v.<br><br>DAVID J. RICHARDS, a resident of the State of Ohio; CLINTON W. WALKER, a resident of the State of California; and DAVID MCMULLIN, a resident of the State of Utah<br><br>            Defendants. | **COMPLAINT FOR:**<br><br>**(1) BREACH OF FIDUCIARY DUTY;**<br><br>**(2) NEGLIGENCE; AND**<br><br>**(3) EQUITABLE SUBORDINATION** |

Plaintiff, Official Committee of Creditors Holding Unsecured Claims of the Bankruptcy Estate of CS Mining, LLC ("**Plaintiff**" or "**Committee**"), hereby brings this adversary proceeding against defendants David J. Richards ("**Richards**"), Clinton W. Walker ("**Walker**") and David McMullin ("**McMullin**") and alleges as follows:

## I.

## NATURE OF ACTION

1.      On February 2, 2018, the Court entered its Order granting the Motion filed by the Committee to seek standing to commence this adversary proceeding against Richards, Walker and McMullin (collectively, the "**Defendants**," or individually by name), on behalf of the Debtor, CS Mining, LLC (the "**Debtor**" or "**CSM**") [Docket No. 1086].

2.      This is an action seeking the imposition of damages against the Defendants, and each of them, for breach of fiduciary duty to the Debtor as a consequence of actions taken by the Defendants and directions given by the Defendants while serving as officers and/or board of directors of the Debtor, as further described in detail herein.

3.      This action also seeks to equitably subordinate the Defendants' Proofs of Claims filed in the Debtor's bankruptcy case, as well as the Defendants' claims for indemnification because Plaintiff is informed and believes and thereon alleges that the claims for which Defendants seek indemnification are the result of gross negligence or willful misconduct and/or beyond the scope of their authority, as further alleged herein below, and according to proof at trial.

## II.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over this matter which is a core proceeding pursuant to 28 U.S.C. § 157(b)(1) and (2)(B) and (O) regarding the Claim for Relief for Equitable

Subordination and pursuant to § 157(c)(1) because the causes of action set forth herein are related to the bankruptcy proceeding. Plaintiff consents to an entry of final order or judgment on the non-core matters by this Court pursuant to 28 U.S.C. § 157(c)(2).

5.      Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

**III.**

**<u>STATEMENT OF RELEVANT FACTS</u>**

A.      **<u>Background Information</u>.**

6.      On June 2, 2016 (the "**<u>Involuntary Petition Date</u>**"), R.J. Bayer Professional Geologist, LC, Minerals Advisory Group, LLC, Rollins Construction & Trucking, LLC, Rollins Machine, Inc., and Oxbow Sulphur, Inc. (collectively, the "**<u>Petitioning Creditors</u>**") filed an involuntary Chapter 11 petition against the Debtor with the United States Bankruptcy Court for the District of Utah, Central Division (the "**<u>Court</u>**"). On August 4, 2016, the Court entered an order for relief [Docket No. 130].

7.      On August 12, 2016, the United States Trustee appointed the Committee in the Debtor's bankruptcy case [Docket No. 181].

8.      The Petitioning Creditors filed the Debtor's involuntary bankruptcy case in order to maintain the going concern value of the Debtor so that it could either reorganize or sell its assets for the best price possible. The Debtor utilized the Chapter 11 case to consummate a sale of substantially all of the Debtor's assets (excluding cash and causes of action) for the benefit of creditors. On August 18, 2017, the Court, authorized and approved, through the entry of its Order entered August 18, 2017, at Docket No. 895, the Debtor's sale of substantially all of its mining and operating assets to Tamra Mining Company, LLC (the "**<u>Sale</u>**"). The Debtor closed on the Sale on August 28, 2017.

B.    **Relevant Individuals and Entities**

9.    Prior to the Sale, the Debtor was owned by three members, all of whom were parties to the Limited Liability Company Agreement of CS Mining, LLC, dated as of October 31, 2011, and amendments thereto (together, the "**Operating Agreement**").

10.    The Members of the Debtor are: (i) Skye Mineral Partners, LLC ("**SMP**"), a Delaware limited liability company; (ii) Robert Reynolds, as representative of the First Lien Lenders under that certain Equity Administration Agreement by and among the former first lien lenders of Western Utah Copper Company ("**WUCC**") and Copper King Mining Corporation ("**CKMC**"), dated June 6, 2011; and (iii) CKMC.

11.    SMP was the majority controlling member of the Debtor, owning approximately 94% of the common membership units of CSM, 100% of the preferred membership units of CSM, and 99.25% of the total membership units of the CSM.  CKMC owned approximately 1% of the common units and 0.12% of the overall units of the Debtor.  Robert Reynolds owned approximately 5% of the common units and 0.62% of the overall units of the Debtor.

12.    SMP is, in turn, owned by four members – Sky Mineral Investors, LLC ("**SMI**"), Clarity Copper, LLC ("**Clarity**"), DXS Capital (U.S.) Limited ("**DXS**"), and PacNet Capital (U.S.) Limited ("**PacNet**").

13.    SMI is an Ohio limited liability company and owns 38.27% of SMP. Richards serves, and at all relevant times has served, as SMI's designated representative to the SMP and CSM Boards.  Clarity is a Delaware limited liability company that owns 33.67% of SMP. Walker serves, and at all relevant times has served, as Clarity's designated representative to the SMP and CSM Boards.  PacNet is a Delaware corporation that owns 14.2% of SMP.    Marshall

Cooper ("**Cooper**")[1] served, at all relevant times, as PacNet's designated representative to the SMP and CSM Boards. DXS is a Delaware corporation that owns 13.8% of SMP. DXS and PacNet are owned and controlled by Lippo China Resources Limited ("**Lippo**") a company traded on the Stock Exchange of Hong Kong, Limited.

14.     Pursuant to Section 5.1 of CSM's Operating Agreement, at all relevant times, CSM's business and affairs were managed by a Board of Managers (the "**CSM Board**"). As members of the CSM Board, Richards and Walker are "insiders" of the Debtor as such term is defined under 11 U.S.C. § 101(31).

### C.     The Debtor's Management

15.     Prior to the Involuntary Petition Date, the business and affairs of the Debtor were managed by and under the direction of the CSM Board, including Richards and Walker. As noted above, Messrs. Cooper, Richards, and Walker also served on, and as, the board of managers of SMP, the majority member of the Debtor.

16.     The CSM Board appointed a management team to assist with the day-to-day operations of the Debtor. As of the Involuntary Petition Date, the Debtor's senior management team included David McMullin ("**McMullin**"), President and Chief Executive Officer, and others. McMullin continues to serve as the Debtor's CEO.

17.     Following the closing of the Sale, the CSM Board appointed and designated, pursuant to the Debtor's Limited Liability Operating Agreement, Peter S. Kravitz of Province Inc. and McMullin as the Debtor's Wind Up Designees for purposes of winding up the Debtor's

---

[1] Pursuant to the Sale Order, Cooper entered into a mutual release with the Debtor of all claims, actions and liabilities for any actions taken by Cooper in his fiduciary capacity as a member of the CSM Board. Accordingly, Cooper is not a defendant in this Adversary Proceeding. Any mention or reference to Cooper herein is for context and is not intended to be construed in any other manner.

business and affairs through a plan of liquidation and Kravitz/Province as the Debtor's Chief

Liquidating Officer (the "**CLO**").  Following the appointment and designation of Mssrs. Kravitz

and McMullin, the members of the CSM Board resigned from the CSM Board, and Mssrs.

Kravitz and McMullin are charged with winding up the Debtor's business and affairs.  As a

result, Richards and Walker no longer serve on the CSM Board.

18.     Richards is the founder of David J. Richards, LLC, an Ohio limited liability

company d/b/a Western US Mineral Investors, LLC ("**WUMI**").  WUMI was managed by three

individuals: Robert Lautz ("**Lautz**"), controlling three manager positions; and Richards and

Walker, each controlling one manager position. Lautz represents WUMI majority member St.

Cloud and Walker represents WUMI minority member Clarity Copper.  Richards represented

WUMI minority member David Richards, LLC ("**Richards, LLC**").

19.     Richards and Walker resigned as WUMI board members on May 26, 2016, and

July 27, 2016, respectively.   Richards, LLC also divested its equity interest in WUMI in mid-

2016.  Clarity Copper still has an ownership interest in WUMI.

**D.     CS Mining's Prepetition Debt Obligations**

20.     Prior to this bankruptcy proceeding, CSM was indebted to several different

lenders, including, but not limited to: (a) SMP; (b) WUMI; and (C) Noble Americas Corp.

("**Noble**")/Waterloo Street Limited ("**Waterloo**").  Indeed, CSM's prepetition debt obligations

included loans held by SMP (the "**SMP Loan**"), loans from WUMI (the "**WUMI Loan**"), and a

loan from Noble, subsequently acquired by Waterloo (the "**Noble/Waterloo Loan**").

**1.     The SMP Loan**

21.     On November 10, 2011, CSM, as borrower, and SMP, as lender, entered into a

Joint Loan Modification Agreement (together with amendments thereto, the "**SMP Loan**

**Agreement**") whereby CSM and SMP agreed to modify the terms of certain debt instruments previously issued by WUCC and CKMC, which SMP acquired and CSM assumed in connection with CSM's purchase of assets in the WUCC and CKMC bankruptcies (the "**SMP Loan**").

22.    In connection with the SMP Loan, at the time of the SMP Loan Agreement, SMP held a security interest in substantially all of CSM's assets.  Pursuant to a Debt Subordination Agreement dated August 10, 2012 (the "**SMP/WUMI Subordination Agreement**"), SMP agreed to subordinate its payment, debt and lien rights in connection with  the SMP Loan to WUMI's debt and lien rights under the WUMI Loan.  In addition, two years later, pursuant to an Intercreditor and Subordination Agreement dated August 12, 2014, SMP agreed to further subordinate its payment, debt and lien rights under the SMP Loan Agreement to Noble's debt and lien rights under the Noble/Waterloo Loan.

2.    **The WUMI Loan**

23.    On August 10, 2012, CSM, as borrower, and WUMI, as lender, entered into a Loan and Security Agreement (the "WUMI Loan Agreement"), subsequently amended from time to time. Pursuant to the terms of the WUMI Loan Agreement and subsequent amendments, WUMI agreed to lend money to CSM to fund operations and/or make capital investments subject to an interest rate of 12.5% per annum.   The WUMI Loan Agreement, in conjunction with the SMP/WUMI Subordination Agreement, also gave WUMI a senior lien over substantially all of CSM's assets.

3.    **The Noble/Waterloo Loan, The Intercreditor Agreement, And The Tenth Amendment To The WUMI Loan**

24.    On or about August 12, 2014, in a continued effort to obtain needed financing, CSM, as borrower, secured a $30 million loan from Noble, a Delaware corporation conducting

business in Utah, pursuant to a Loan and Security Agreement (together with the amendments thereto, the "**Noble/Waterloo Loan Agreement**"). Noble, which is in the business of marketing and distributing energy, metals, and mineral products, including copper, agreed to provide financing to CSM in large part because of its interest in securing warrants in SMP and copper supply agreements with CSM. CSM and Noble (and to some extent, WUMI) memorialized their respective obligations in connection with the Noble/Waterloo Loan into four Agreements: (i) the Noble/Waterloo Loan Agreement; (ii) an Intercreditor Agreement between CSM, Noble, and WUMI (the "**Intercreditor Agreement**"); (iii) a Copper Concentrate Sales and Purchase Agreement (the "**Concentrate Agreement**"); and (iv) a Copper Cathode Sales and Purchase Agreement (the "**Cathode Agreement**" and together with the Concentrate Agreement, the "**Supply Agreements**").

25.     The Noble/Waterloo Loan Agreement required Noble to loan to CSM $15 million initially, and a second $15 million (for a total of $30 million) if and when CSM was able to raise $15 million in matching equity financing (the "**Matching Equity Financing**"). Under the Intercreditor Agreement, and as an inducement to Noble to provide CSM with the funds under the Noble/Waterloo Loan Agreement, WUMI agreed to subordinate certain of the liens it held against CSM's assets to Noble's liens, while retaining a senior lien on certain other assets.

26.     In addition, pursuant to the Intercreditor Agreement WUMI agreed that it would convert its remaining debt into equity in SMP once Noble advanced the full $30 million it was committing to lend CSM under the Noble/Waterloo Loan Agreement, thus reducing CSM's debt burden and freeing CSM's assets from WUMI's liens. WUMI understood that its promise to convert was an inducement for Noble to enter into the Noble/Waterloo Loan Agreement.

27.     Section 5.2 of the Intercreditor Agreement provides that in the event that "Noble loans [CSM] the [$30 million] pursuant to the Noble/Waterloo Loan Agreement, and there are no existing defaults under the Noble/Waterloo Loan Agreement or that occur in connection with lending the [$30 million], [WUMI] agrees to promptly (but in any event within 5 business days] convert [its loan] in full into equity of [SMP], pursuant to the terms of the [Richards] Loan Agreement . . . . In connection with such conversion, the [WUMI Loan Agreement] obligations will be extinguished [and] all [l]iens held by [WUMI] on [c]ollateral shall be released."

### E.     Events After The Funding Of The Noble/Waterloo Loan

28.     On August 12, 2014, concurrently with the execution of the Noble/Waterloo Loan Agreement, the Intercreditor Agreement, and the Supply Agreements, Noble funded the initial $15 million of funding.  CSM then took steps to secure the $15 million in Matching Equity Financing that would trigger CSM's ability to access the second $15 million tranche of Noble financing and WUMI's corresponding obligation under the Intercreditor Agreement to convert its debt into equity and release its liens.

29.     On March 10, 2015, Noble began funding the second $15 million tranche by providing CSM with $3.75 million of funding.  That same day, WUMI and CSM's CEO, McMullin, executed the Tenth Amendment to Loan and Security Agreement dated as of March 10, 2015 (the "Tenth Amendment"), which purported to modify the WUMI Loan Agreement by prohibiting CSM from drawing down more than $29.75 million under the Noble/Waterloo Loan Agreement without first notifying WUMI and obtaining WUMI's consent and approval.

30.     The Tenth Amendment enabled WUMI to prevent CSM from drawing down the full $30 million, thereby forestalling WUMI's obligation to convert its loan into equity and release its liens under the Intercreditor Agreement.  Notably, the Tenth Amendment to the

WUMI Loan Agreement, unlike the prior nine amendments, was not approved by all three members of CSM's Board. Indeed, Richards and Walker chose not to obtain the consent of Cooper, the Chairman of the CSM Board, before directing McMullin to sign the Tenth Amendment, which McMullin did.

31.     Richards, who was a member of WUMI and at the same time a director of CSM, led the negotiations with respect to the Tenth Amendment. Upon information and belief, Richards caused McMullin to execute the Tenth Amendment even though Richards and Walker had not sought approval from Cooper as to all of its terms, nor informed Cooper that the proposed Tenth Amendment would place a cap on CSM's ability to draw down the Noble/Waterloo Loan. Upon information and belief, Richards and Walker did not inform Cooper of all of the terms of the Tenth Amendment prior to its execution because they intended for the Tenth Amendment to benefit themselves and WUMI at the expense of the Debtor and other creditors.

32.     On April 15, 2015, due to ongoing difficulties in obtaining Matching Equity Financing from CSM's members, the parties amended the Noble/Waterloo Loan Agreement a second time to again extend the deadline for obtaining Matching Equity Financing. On or about April 24, 2015, PacNet, Clarity, and SMI entered into a Membership Unit Purchase Agreement to provide the Matching Equity Financing by purchasing additional equity interests in SMP in the amount of $15 million. The $15 million in funding, once provided pursuant to the Membership Unit Purchase Agreement, would enable CSM to obtain the full second $15 million tranche of funding under the Noble/Waterloo Loan Agreement.

33.     By June 4, 2015, CSM's members had invested a total of $15 million in SMP pursuant to the Membership Unit Purchase Agreement. Thus, as of June 4, 2015, CSM had

satisfied the condition in the Noble/Waterloo Loan Agreement that it obtain $15 million in Matching Equity Financing in order to obtain the second $15 million tranche of Noble financing. Noble therefore provided CSM with additional funding, and as of July 8, 2015, Noble had provided CSM with $29.75 million of the $30 million of the funds available under the Noble/Waterloo Loan Agreement. The remaining $250,000 available on the Noble/Waterloo Loan Agreement was not drawn down in 2015 even though Cooper advocated for the draw down and the Debtor desperately needed the cash.  Waterloo, after it purchased the Noble/Waterloo Loan from Noble, provided CSM with the remaining $250,000 on February 3, 2016.

### F.      The CSM Operating Agreement

34.      CSM is governed in accordance with the Operating Agreement. Pursuant to Section 5.1 of CSM's Operating Agreement, the business and affairs of CSM are to be managed by the CSM Board.

35.      At all relevant times, the CSM Board consisted of Richards, Walker, and Cooper.

36.      Under Section 5.1(g) of the Operating Agreement, at all relevant times, Richards and Walker (and Cooper) each owed "a fiduciary duty to the Company and the Members that was the same as the duty that a director of a Delaware corporation owes to a corporation and its stockholders . . . ."  Thus, Richards and Walker (and Cooper) each owed CSM and its members the common law fiduciary duties of care and loyalty.

### G.      CSM's Operating Strategy And Plans – The Floatation Mill (Phase I) And The Agitated Leach Facility (Phase II)

37.      Following its purchase of WUCC and CKMC's assets, CSM embarked on its two-part business plan: (i) optimize and restart operations of WUCC's existing flotation mill (the "**Flotation Mill**" or "**Phase I**"); and (ii) construct a state-of-the-art agitated leach processing

facility designed to maximize recovery of oxide copper ore via an agitated leach circuit and counter current decantation processing circuit (the "**Agitated Leach Facility**" or "**Phase II**").

38.     The CSM Board authorized and approved CSM's two-part business plan, and was aware, at all relevant times, that implementation of Phase II of the project was necessary to CSM's ongoing business and operations.

39.     Shortly after acquiring WUCC and CKMC's assets on November 14, 2011, CSM began to implement Phase I of the project, including seeking to optimize and restart operations of the Flotation Mill.

40.     CSM's plan was to have the Flotation Mill up and running in ninety days.  Due to various operational setbacks, it ultimately took about a year to fully restart the Flotation Mill.  In the meantime, copper prices decreased, and CSM was not able to extract the volume of copper that it had anticipated.  As a result, CSM was not able to earn the revenue it expected to earn during Phase I, and it was accordingly not able to fully fund Phase II using Phase I revenues, as it had planned.

41.     Although CSM was able to complete construction of the Agitated Leach Facility, due to significant liquidity constraints, lack of funding, and delays in constructing the floatation mill, CSM was not able to capitalize on the benefits of its state of the art Agitated Leach copper production capabilities.  Without a further infusion of cash through either equity or loans, CSM's bankruptcy became unavoidable.

## IV.

## RICHARDS, WALKER, SMI, AND CLARITY PREVENT WUMI'S

## CONVERSION OBLIGATION FROM BEING TRIGGERED TO CSM'S PERIL

### A.      CSM'S Liquidity Crisis

42.      In the second half of 2015, CSM continued to face ongoing liquidity and cash flow issues.  By the summer of 2015, CSM's management had put Richards and Walker on notice that a substantial cash infusion was needed urgently to complete construction of the new processing facility. At that time, but for the Tenth Amendment, CSM would have drawn down the remaining amount of the Noble Loan, and WUMI would have been required to convert the WUMI loan to equity of SMP.

43.      The Noble Loan Agreement required that CSM complete the new facility by November 30, 2015, and that CSM begin to make payments under the Noble Loan starting in October 2015, which CSM did not have the ability to do.

44.      The Committee is informed and believes and thereon alleges that at or about this time, Richards and Walker knew that if CSM did not get an infusion of cash to complete the processing facility, it would default on the Noble Loan.

45.      The Committee is informed and believes and thereon alleges that Richards and Walker knew that a default under the Noble Loan could relieve WUMI of its obligation to convert its debt to equity.

46.      The Committee is informed and believes and thereon alleges that because of their financial interest in the WUMI Loan, Richards and Walker wanted WUMI to avoid its conversion obligation so that WUMI's secured, senior position with respect to CSM's assets would be preserved.

47.     The Committee is informed and believes and thereon alleges that in furtherance of this goal, Richards and Walker took action to prevent CSM from receiving new financing, including but not limited to the following:

a.     Without full Board approval, Richards and Walker directed McMullin to cause CSM to enter into the Tenth Amendment, which prevented the conversion of the WUMI Loan to equity, and thus inhibited the ability of CSM to obtain new financing.

b.     Richards and Walker rejected a proposal for an $8 million equity investment in SMP that PacNet submitted in September 2015, to the detriment of CSM.

c.     In October 2015, Richards and Walker rejected a second proposal from PacNet that would have provided a much needed $2.6 million equity investment and a $6 million loan.

d.     In late October 2015, Richards and Walker rejected a third proposal from PacNet, for a $22.4 million equity investment and a $10 million secured loan.

e.     Richards and Walker ultimately did accept a financing proposal offered by PacNet in late November 2015, but by that time the Noble Loan deadlines had passed and it was too late avoid a default on the Noble Loan.

f.     By rejecting needed financing, Richards and Walker created conditions for a possible default by CSM on the Noble Loan, consistent with their plan to prevent WUMI from having to convert its loan to equity, to the detriment of CSM.

**B.     <u>Noble Transfers Its Loan To Waterloo</u>**

48.     As CSM continued to struggle financially, Noble was experiencing its own financial difficulties and accordingly began exploring the possibility of selling its loan.

49.     In fact, in November 2015, Noble sent a letter to CSM identifying "Events of Default" related to the Noble Loan Agreement and, among other things, reserving its right "to

sell or assign" the Noble Loan Agreement to "one or more Eligible Assignees without the consent of the Company."

50.     WUMI, through Richards and Walker, engaged in dialogue to acquire the Noble Loan, which Richards and Walker concealed from CSM, and in particular, Cooper.

51.     At this same time, Waterloo, through Cooper, was also engaged in dialogue to acquire the Noble Loan, which Cooper and Waterloo concealed from CSM and Richards and Walker.

52.     On December 30, 2015, Noble sent another letter to CSM again identifying "Events of Default" related to the Noble Loan Agreement and, among other things, reserving its right "to sell or assign" the Noble Loan Agreement to "one or more Eligible Assignees without the consent of the Company."

53.     On December 31, 2015, Waterloo acquired the Noble loan.  Specifically, Waterloo, which is owned and controlled by Lippo, entered into a Purchase and Sale Agreement under which it acquired Noble's interests and assumed Noble's obligations under the Noble Loan Agreement and the Intercreditor Agreement.

54.     Waterloo notified CSM of its acquisition of Noble's interests on or about January 7, 2016.

**C.    Drawing Down Of The Noble Loan And WUMI's Failure To Convert**

55.     On February 3, 2016, CSM drew down the last installment under the Noble Loan Agreement, bringing the total amount loaned to CSM under the Noble Loan Agreement to $30 million, which draw required WUMI to convert its debt into equity and release its remaining liens.  This is what WUMI, through Richards and Walker, had attempted to avoid.

56.     On February 4, 2016, Waterloo (having acquired the Noble Loan) sent a letter to CSM agreeing to waive any defaults that might have existed as of that date, in order to compel WUMI's conversion of its debt into equity and release its remaining liens.

57.     As of February 4, 2016, Noble/Waterloo had fulfilled the obligation to fully fund $30 million, and no defaults existed as described in Section 8.01 in the Noble Loan Agreement, as any events of default that may have existed had been waived by Waterloo.

58.     Thus, under the Intercreditor Agreement, WUMI was obligated to convert its debt into equity and release its remaining liens by no later than February 11, 2016.

59.     Despite being obligated to convert its loan into SMP equity and to take steps to release its liens, WUMI has refused to do so.

### D.     WUMI's Improper Enforcement Actions

60.     Not only did WUMI refuse to convert its debt into equity and release its remaining liens, but also it sent an Enforcement Action Notice Letter declaring its intent to take Enforcement Action, as defined in the Intercreditor Agreement.

61.     On February 29, 2016, WUMI's attorneys sent a letter purporting to accelerate all moneys CSM allegedly owed to WUMI pursuant to the WUMI Loan Agreement.

62.     Then, on April 11, 2016, WUMI filed "Notices of Default and Election to Sell" (the "**Notices of Default**") with respect to CSM's real property and mining interests.  The Notices of Default state that they are intended to permit WUMI to seize CSM's assets and subject them to foreclosure sale under Title 57, Chapter 1, of the Utah Code.

63.     The real estate and mining claims subject to WUMI's threats of foreclosure were carefully selected and acquired by CSM because they hold valuable and unique mineral deposits. Indeed, among the properties on which WUMI had threatened to foreclose was a parcel CSM needed to construct a new "tailings pond" to deposit the rock and process effluents that are

generated by its processing plant.  Without a place to deposit these materials, CSM would not be able to continue its ore processing operation once the capacity of its existing "tailings pond" was exhausted.

64.     Similarly, the water rights and equipment that WUMI had threatened to seize were both vital to CSM's business.  CSM needed access to water to be able to run its operations. Water is used as an essential element at various stages in the refining process.  The ball mills on which WUMI held liens were central to its processing operations.  Without them, CSM would not be able to process copper ore into a commercially viable product.

65.     The Committee is informed and believes and thereon alleges that WUMI's conduct as outlined herein violated Section 5.2 of the Intercreditor Agreement, pursuant to which the liens previously held by WUMI should have been released, and that WUMI's conduct, directed by Richards and/or Walker, caused damages to CSM.

66.     On April 5, 2016, Waterloo filed a complaint against WUMI to enjoin WUMI's collection efforts.  Similarly, on May 18, 2016, Lippo affiliates and SMP members, DXS and PacNet, filed a complaint against WUMI, and nominally against SMP and CSM, to enjoin those same collection efforts.

67.     On April 12, 2016, counsel for PacNet and DXS wrote to Richards and Walker (and McMullin) to demand that CSM take action to enjoin WUMI from following through on its threats, but they each failed and refused to do so, instead choosing their own economic interests over CSM's.

68.     Despite earlier promises to take action to prevent WUMI's threatened unlawful conduct, Richards and Walker did nothing, thereby choosing to allow WUMI to take action to

foreclose on CSM's assets, to the detriment of CSM, and for the benefit of WUMI, and by extension, Richards and Walker.

69.     The Committee is informed and believes and thereon alleges that, Richards and Walker affirmatively agreed that Richards and Walker should take no action so that WUMI could pursue its own interests at the expense of CSM.

70.     In the wake of Richards' and Walker's failure to act, on May 18, 2016, Lippo affiliates and SMP members, DXS and PacNet, filed a complaint against WUMI, and nominally against SMP and CSM, to enjoin those same collection efforts.

### E.     CS Mining Declares Bankruptcy

71.     Due to, among other things, the self-interested actions undertaken by Richards and Walker, WUMI's failure to convert its debt to equity and release of its liens on CSM's property, WUMI's improper attempts to enforce its liens thereafter, CSM's financial struggles continued throughout 2016 and ultimately led to the filing of the involuntary bankruptcy petition.

### F.     Richards, Walker and McMullin Filed Proofs of Claim in Debtor's Bankruptcy Case and Made Demand for Indemnification

72.     On or about January 23, 2018, Richards, Walker and McMullin, made demand for indemnification of multiple claims pending against them (the "Indemnity Demand") pursuant to terms of the CSM Operating Agreement and the October 31, 2011 letter agreement regarding Management Services with Clarity Management, L.P. and Empire Advisors LLC.

73.     The Indemnity Demand sought the establishment of reserves for indemnification in an aggregate amount of $5,300,000 based on claims pending or contemplated against Richards, Walker and McMullin.

74.     Prior to and following the Indemnity Demand, Richards, Walker and McMullin filed several proofs of claims and claims for recovery of alleged administrative expenses incurred post-petition.[2]  Those Proofs of Claims are as follows:

(a)     Richards filed Proof of Claim Number 163 as an Administrative Expense Priority Claim in the sum of $199,623, and an identical Application of David J. Richards for Allowance of Administrative Expense Priority Claim Pursuant to 11 U.S.C. §§ 503(B)(1)(A) and 507(a)(2) as Docket No. 890 (collectively, the "Richards Claim"), for alleged post-petition services, along with attachments of the October 31, 2011 letter agreement for Management Services with Clarity Management, L.P. and Empire Advisors LLC, and calculation exhibit setting forth the basis for the amount stated.

(b)     Walker filed (i) Proof of Claim Number 20012 in the sum of $341,666.67, stating basis as contract/executory contract; (ii) Proof of Claim Number 199 (on May 11, 2018) as a purported rejection claim, duplicating Claim Number 20012 as to the sum of $341,666.67 asserted in that claim, and adding asserted indemnity claims totaling $3,800,000, for a total claim amount of $4,141,666.67; and (iii) an Administrative Expense Priority Claim [on the Bankruptcy Case Docket, No. 946], in the sum of $199,623, for alleged post-petition services, including as attachments the October 31, 2011 letter agreement for Management Services with Clarity Management, L.P. and Empire Advisors LLC, and a calculation exhibit, which claims are collectively referred to herein as the "Walker Claims."

---

[2] The Committee reserves the right  to assert and file additional objections to these Proofs of Claims, or any others which may be filed by Richards, Walker and McMullin, separate from this adversary proceeding.

(c)     McMullin filed Proof of Claim Number 20016 in the sum of $192,000 (the "McMullin Claim"), stating as the basis a contract/executory contract including an attachment which requests CSM Board to pay incentives in the amount of $192,000.

75.     Plaintiff is informed and believes and thereon alleges that the claims underlying the Indemnity Claims against Richards, Walker and McMullin, and each of them, are based upon their activities and conduct constituting gross negligence and willful misconduct, and for these reasons, Richards, Walker and McMullin are not entitled to indemnification as requested in the Indemnification Demand.

**G.     Summary of Alleged Conduct Engaged in By Richards, Walker and McMullin**

76.     Richards and Walker were members of the CSM Board, and, as such, owed CSM the fiduciary duties of loyalty and care.  Indeed, Section 5.1(g) of CSM's Operating Agreement provides that Managers each have "a fiduciary duty to the Company and the Members that is the same as the duty that a director of a Delaware corporation owes to a corporation and its stockholders . . . ."

77.     Plaintiff is informed and believes and thereon alleges that Richards and Walker breached their fiduciary duties to CSM when they engaged in the following conduct:

a.     Causing CSM to enter into the Tenth Amendment to the WUMI Loan Agreement which purported to limit CSM's access to necessary capital absent WUMI's consent and approval;

b.     Preventing CSM from drawing down the remaining $250,000 available under the Noble/Waterloo Loan;

c.     Causing McMullin to execute the Tenth Amendment to the WUMI Loan Agreement without seeking the approval of Cooper, because Richards and Walker

intended for this loan amendment to benefit themselves and WUMI at the expense of CSM by allowing WUMI to reap the benefit of not having to convert its debt to equity;

       d.      Rejecting multiple proposals for much needed financing because the proposals may have lessened Richards' and Walker's control of and position with respect to CSM and/or their financial interests in WUMI;

       e.      Failing to take any action when WUMI wrongfully refused to convert its debt to equity and release its liens as required under an Intercreditor Agreement once CSM did draw down the full $30 million under the Noble/Waterloo Loan Agreement;

       f.      Failing to authorize legal action to block WUMI from improperly foreclosing upon CSM's assets, and affirmatively authorizing WUMI to do so even though Richards and Walker had the right under the WUMI Operating Agreement to block WUMI's ability to foreclose on CSM's assets; and

       g.      Failing to take appropriate steps to ensure that CSM would not be exposed to substantial penalties in connection with WARN Act Damages (defined below) which resulted when CSM terminated its employees without sufficient written notice, thereby exposing CSM to substantial penalties in excess of $1,100,000, as well as the loss of the ability to assert the WARN Act Defenses (defined below).

      78.      Plaintiff is informed and believes and thereon alleges that McMullin breached his fiduciary duties to CSM when McMullin (a) executed the Tenth Amendment on behalf of CSM; and (b) failed to take appropriate steps to ensure that CSM would not be exposed to the substantial penalties in excess of $1,100,000 suffered by CSM pursuant to the WARN Act when McMullin terminated CSM's employees without sufficient written notice.

79.     As a consequence of McMullin's conduct in termination of the CSM employees without sufficient written notice, CSM was deprived of the ability to assert certain otherwise valid defenses to WARN Act liability, which defenses would have mitigated the potential damages to be assessed against CSM in the WARN Act Litigation.  However, because those defenses were no longer available to CSM pursuant to the ruling of the Court, including the "Unforeseeable Business Exception" and the "Faltering Business Exception"  (the "WARN Act Defenses"), WARN Act penalties and related damages in the sum of more than $1,100,000 (the "WARN Act Damages") were imposed upon CSM.

80.     As a result of the failure of McMullin to provide proper notice prior to termination of CSM's employees, a class action lawsuit was filed by these terminated employees against CSM seeking liability and imposing damages and penalties in a sum in excess of $1,100,000 (the "WARN Act Litigation").  The WARN Action Litigation was ultimately settled by the parties after an adverse ruling against CSM, that as a consequence of McMullin's conduct, CSM was legally unable to assert the WARN Act Defenses, which would have otherwise provided a legal basis for mitigation of the WARN Act Damages alleged against CSM in the WARN Act Litigation.

**FIRST CLAIM FOR RELIEF FOR**

**BREACH OF FIDUCIARY DUTY**

**AGAINST DAVID J. RICHARDS AND CLINTON W. WALKER**

81.     Plaintiff repeats and re-alleges each of the preceding allegations set forth in paragraphs 1 – 80, inclusive, as if set forth herein.

82.     At all pertinent times, Richards and Walker were members of the CSM Board. As such, they owed CSM the fiduciary duties of loyalty and care.

83.     Section 5.1(g) of the Company's Operating Agreement provides that Managers each have "a fiduciary duty to the Company and the Members that is the same as the duty that a director of a Delaware corporation owes to a corporation and its stockholders  . . . ."

84.     Plaintiff is informed and believes and thereon alleges that Richards and Walker, and each of them, breached the fiduciary duties they owe to CSM by, *inter alia*:

     a.     Causing CSM to enter into the Tenth Amendment to the WUMI Loan Agreement which purported to limit CSM's access to necessary capital absent WUMI's consent and approval;

     b.     Preventing CSM from drawing down the remaining $250,000 available under the Noble/Waterloo Loan;

     c.     Causing McMullin to execute the Tenth Amendment to the WUMI Loan Agreement without seeking the approval of Cooper, because Richards and Walker intended for this loan amendment to benefit themselves and WUMI at the expense of CSM by allowing WUMI to reap the benefit of not having to convert its debt to equity;

     d.     Rejecting multiple proposals for much needed financing because the proposals may have lessened Richards' and Walker's control of and position with respect to CSM and/or their financial interests in WUMI;

     e.     Failing to take any action when WUMI wrongfully refused to convert its debt to equity and release its liens as required under an Intercreditor Agreement once CSM did draw down the full $30 million under the Noble/Waterloo Loan Agreement;

     f.     Failing to authorize legal action to block WUMI from foreclosing upon CSM's assets, and affirmatively authorizing WUMI to do so even though Richards and

Walker had the right under the WUMI Operating Agreement to block WUMI's ability to foreclose on CSM's assets; and

g.      Failing to take appropriate steps to ensure that CSM would not be exposed to substantial penalties in connection with WARN Act Damages which resulted when CSM terminated its employees without sufficient written notice, thereby exposing CSM to substantial penalties in excess of $1,100,000, as well as the loss of the ability to assert the WARN Act Defenses in connection with termination of CSM's employees and waiver of the WARN Act Defenses.

85.    Plaintiff therefore seeks a judgment declaring that Richards and Walker have breached their fiduciary duties to CSM and awarding damages against Richards and Walker in favor of Plaintiff in an amount to be proven at trial.

<u>**SECOND CLAIM FOR RELIEF FOR**</u>

<u>**BREACH OF FIDUCIARY DUTY AGAINST DAVID MCMULLIN**</u>

86.    Plaintiff repeats and re-alleges each of the preceding allegations set forth in paragraphs 1 – 80, inclusive, as if set forth herein.

87.    At all pertinent times, McMullin as Chief Executive Officer of CSM owed a fiduciary duty to CSM to act in a prudent manner and make decisions for the best interest of the CSM.

88.    Plaintiff is informed and believes and thereon alleges that McMullin's decision to enter into the Tenth Amendment to the WUMI Loan without notice to Cooper, the Chairman and member of the CSM Board of Directors, was in breach of McMullin's duty to CSM.

89.    Plaintiff is informed and believes and thereon alleges that McMullin's termination of CSM's employees, without taking appropriate steps to ensure that CSM would not be exposed

to substantial penalties in connection with WARN Act Damages which resulted when McMullin terminated CSM's employees without sufficient written notice, thereby exposing CSM to substantial penalties in excess of $1,100,000, as well as the loss of the ability to assert the WARN Act Defenses that could have been avoided, had McMullin acted in a prudent manner.

90.     Plaintiff is informed and believes and thereon alleges that McMullin's actions as described herein constitute a breach of those fiduciary duties owed by McMullin to CSM.

91.     As a consequence of McMullin's breach of fiduciary duties as outlined herein, CSM has sustained damages in an amount according to proof at trial.

## THIRD CLAIM FOR RELIEF FOR

## NEGLIGENCE AGAINST DAVID MCMULLIN

92.     Plaintiff repeats and re-alleges each of the preceding allegations set forth in paragraphs 1 – 80, inclusive, as if set forth herein.

93.     At all pertinent times, McMullin, as the Chief Executive Officer of Debtor, owed a duty of care to CSM to act in a prudent manner and make decisions for the best interest of the Debtor.

94.     Plaintiff is informed and believes and thereon alleges that McMullin's decisions to enter into the Tenth Amendment to the WUMI Agreement without notice to Cooper and McMullin's termination of CSM's employees with insufficient written notice were both negligent acts which have caused damages to CSM in an amount according to proof at trial.

95.     Plaintiff is informed and believes and thereon alleges that but for the conduct of McMullin, CSM would not have sustained damages as a consequence of the Tenth Amendment to the WUMI Agreement.

96.     Plaintiff is informed and believes and thereon alleges that but for the conduct of McMullin, CSM would not have been exposed to the WARN Act Damages which resulted when CSM terminated its employees without sufficient written notice, thereby exposing CSM to substantial penalties in excess of $1,100,000, as well as the loss of the ability to assert the WARN Act Defenses.

97.     Plaintiff is informed and believes and thereon alleges that McMullin's conduct in failing to provide adequate notice, including McMullin's failure to obtain an opinion of legal counsel as to the proper way to terminate employees in these circumstances and how to best protect CSM, imposed upon CSM as a consequence the WARN ACT Damages.

98.     As a consequence of McMullin's conduct as outlined herein, CSM has sustained damages in an amount according to proof at trial.

## FOURTH CLAIM FOR RELIEF FOR

## EQUITABLE SUBORDINATION OF CLAIMS AGAINST

## DAVID J. RICHARDS, CLINTON W. WALKER  AND DAVID MCMULLIN

99.     Plaintiff repeats and re-alleges each of the preceding allegations set forth in paragraphs 1 – 98, inclusive, as if set forth herein.

100.     Plaintiff is informed and believes and thereon alleges that the Defendants, and each of them have engaged in inequitable conduct which has caused injury to CSM and its creditors such that it is consistent with 11 U.S.C. 510(c) for equitable subordination of the Indemnity Demand, Richards Claim, Walker Claims and McMullin Claim.

101.     Plaintiff is informed and believes and thereon alleges that the Indemnity Demand, Richards Claim, Walker Claims and McMullin Claim should be subordinated because Richards,

Walker and McMullin, and each of them have engaged in misconduct which is indubitably "inequitable" and as alleged herein above, including but not limited to breach of fiduciary duty.

102.   Plaintiff is informed and believes and thereon alleges that, as "insiders" of CSM, Richards, Walker and McMullin, and each of them, engaged in conduct that was unfair, including but not limited to, *inter alia*:

      a.   Causing CSM to enter into the Tenth Amendment to the WUMI Loan Agreement which purported to limit CSM's access to necessary capital absent WUMI's consent and approval;

      b.   Preventing CSM from drawing down the remaining $250,000 available under the Noble/Waterloo Loan;

      c.   Causing McMullin to execute the Tenth Amendment to the WUMI Loan Agreement without seeking the approval of Cooper, because Richards and Walker intended for this loan amendment to benefit themselves and WUMI at the expense of CSM by allowing WUMI to reap the benefit of not having to convert its debt to equity;

      d.   Rejecting multiple proposals for much needed financing because the proposals may have lessened Richards' and Walker's control of and position with respect to CSM and/or their financial interests in WUMI;

      e.   Failing to take any action when WUMI wrongfully refused to convert its debt to equity and release its liens as required under an Intercreditor Agreement once CSM did draw down the full $30 million under the Noble/Waterloo Loan Agreement;

      f.   Failing to authorize legal action to block WUMI from foreclosing upon CSM's assets, and affirmatively authorizing WUMI to do so even though Richards and

Walker had the right under the WUMI Operating Agreement to block WUMI's ability to foreclose on CSM's assets; and

 g. Failing to take appropriate steps to ensure that CSM would not be exposed to substantial penalties in connection with WARN Act Damages which resulted when McMullin terminated CSM's employees without sufficient written notice, thereby exposing CSM to substantial penalties in excess of $1,100,000, as well as the loss of the ability to assert the WARN Act Defenses.

103. Accordingly, Plaintiffs seeks equitable subordination of the Indemnity Demand, Richards Claim, Walker Claims and McMullin Claim (the "Subordinated Claims") to all other claims in CSM's estate and postponing any repayment of the Subordinated Claims until such time as the other claims in CSM's estate have been satisfied.

**WHEREFORE**, the Plaintiff respectfully requests for the Court to enter judgment in favor of Plaintiff and against the Defendants, and each of them,  as follows:

A. Declaring that Richards breached his fiduciary duties to CSM and enter judgment against Richards in an amount according to proof at trial;

B. Declaring that Walker breached his fiduciary duties to CSM and enter judgment against Walker in an amount according to proof at trial;

C. Declaring that McMullin breached his fiduciary duties to CSM, or in the alternative, that McMullin engaged in acts of negligence against CSM and enter judgment against McMullin in an amount according to proof at trial;

D. Awarding damages to CSM for each of the wrongs alleged against Richards, Walker and McMullin in an amount according to proof at trial;

E.      Awarding attorneys' fees, legal costs, and other expenses incurred by Plaintiff against the Defendants, and each of them, in an amount according to proof at trial;

F.      Subordinating the Indemnity Demand, Richards Claim, Walker Claims and McMullin Claim to all claims in CSM's estate and postponing any repayment of the Subordinated Claims until such time as the other claims in CSM's estate have been satisfied; and

G.      Granting any other further relief that the Court deems just and proper.


Dated:  May 22, 2018                    **LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.**


                    _____*/s/ Martin J. Brill*_____
                    Martin J. Brill
                    Philip A. Gasteier
                    Beth Ann R. Young
                    Krikor J. Meshefejian
                    *Counsel for Plaintiff Official Committee of Creditors*
                    *Holding Unsecured Claims*